The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: July 9, 2026

**NO. S-1-SC-40328**

**STATE OF NEW MEXICO,**

> Plaintiff-Appellee,

v.

**JUDAH ELIJAH TRUJILLO,**

> Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mary Marlowe Sommer, District Judge**

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Serena R. Wheaton, Assistant Attorney General
Albuquerque, NM

for Appellee

**OPINION**

**THOMSON, Justice.**

{1}     In the early morning hours of August 10, 2022, fifteen-year-old Judah Elijah Trujillo (Judah) met a stranger, sixty-year-old Samuel Cordero (Samuel), at Ragle Park in Santa Fe, New Mexico, for oral sex. The encounter culminated in Judah killing Samuel with a single gunshot to the back of his head. A jury convicted Judah of willful and deliberate first-degree murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), as well as tampering with evidence of first-degree murder, contrary to NMSA 1978, Section 30-22-5 (2003), for taking Samuel's cell phone after the killing and tossing it out of a car window.

{2}     In this appeal, Judah raises two challenges to his murder conviction: (1) that the State's evidence was insufficient to support a finding of deliberate intent, and (2) that the district court erred by instructing the jury on motive because the pertinent instruction, UJI 14-5029 NMRA, includes a use note specifically stating, "No instruction on this subject shall be given." Judah also argues that, if the Court reverses his conviction for first-degree murder, it should order a new trial "to determine the crime with which the tampering is associated." Finally, Judah asks for presentence confinement time credit to his sentence, as required by NMSA 1978, Section 31-18-15.3(B) (1993, amended 2023)—an issue the State does not contest.

{3}     We hold that the State failed to provide sufficient evidence that Judah acted with deliberate intent. Instead, the jury was left to speculate as to Judah's mental state leading up to the single shot that killed Samuel. We take this opportunity to explain the deficiencies in the State's case and clarify the relationship between consciousness-of-guilt evidence and deliberate intent.

{4}     However, because the jury was instructed on and found all of the essential elements of second-degree murder, we conclude that the interests of justice are best served by direct remand for entry of second-degree murder. *State v. Revels*, 2025-NMSC-021, ¶ 43, 572 P.3d 974 (explaining that when "directing the disposition of a case after remand . . . the ultimate inquiry is whether retrial or resentencing is in the interests of justice"); *see also State v. Haynie*, 1994-NMSC-001, ¶ 4, 116 N.M. 746, 867 P.2d 416 ("[T]here is no need to retry a defendant for a lesser included offense when the elements of the lesser offense necessarily were proven to a jury beyond a reasonable doubt in the course of convicting the defendant of the greater offense.").

{5}     Judah also claims that the district court erred when it instructed the jury on motive despite UJI 14-5029's use note stating, "No instruction on this subject shall be given." Because Judah did not object to this instruction at trial, it is subject to review for fundamental error. *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621,

92 P.3d 633. Fundamental error occurs where "a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *Id.* ¶ 17.

{6}     We agree with Judah that the district court erred in failing to adhere to the use note, and we take this opportunity to emphasize for district courts that use notes are binding on lower courts. *Delfino v. Griffo*, 2011-NMSC-015, ¶ 19, 150 N.M. 97, 257 P.3d 917 ("Use notes, though not part of the statute or jury instruction, are adopted by this Court and binding on district courts."). However, Judah has failed to articulate how the instruction created "circumstances that shock the conscience or implicate a fundamental unfairness that would undermine judicial integrity if left unchecked." *State v. Mascareñas*, 2000-NMSC-017, ¶ 17, 129 N.M. 230, 4 P.3d 1221 (text only)[1] (citation omitted). Furthermore, our reversal of Judah's first-degree murder conviction ameliorates any unfairness underlying his conviction potentially caused by the motive instruction.

---

[1]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

## I. BACKGROUND

{7}     There is no dispute that Judah shot Samuel. The State attempts to undercut Judah's sufficiency challenge by highlighting the sheer volume of evidence presented in its case-in-chief—including more than eighty exhibits, twenty witnesses, and records obtained both from a search engine and from a dating app. However, the bulk of the State's evidence at trial, including the testimony of more than a dozen law enforcement personnel, primarily served to eliminate any reasonable doubt that Judah was the person who shot Samuel at Ragle Park, took his phone, and tossed it alongside Rodeo Road. Therefore, much of the State's evidence at trial is peripheral to this appeal. Judah's exclusive challenge to first-degree murder is sufficiency with regard to deliberate intent. Accordingly, we focus on the evidence presented at trial, including Judah's own testimony, supporting that element.

### A.     Events Leading up to the Shooting

{8}     Judah and Samuel met through Grindr, a dating app geared toward LGBTQ+ men and nonbinary individuals. Judah lied about his age to create his account, which indicated that he was nineteen at the time he connected with Samuel. In fact, he was fifteen. Samuel had multiple accounts and also lied about his age, making profiles that stated he was forty-nine and fifty-two rather than sixty. Judah testified that Samuel messaged him first around 3:00 p.m. on August 9, 2022, the day before

Samuel's body was found in Ragle Park. Judah agreed to meet with Samuel for what he understood to be oral sex and gave Samuel the address where he was staying with his mother at the time.

{9} Samuel, again, contacted Judah in the early hours of August 10, 2022, after his shift ended, to ask if Judah still wanted to meet. Judah agreed but said that they could not meet at his house anymore because his mother and sister were there. Samuel suggested they meet at Ragle Park, and Judah agreed as it was a public place.

{10} Data from Judah and Samuel's phones indicate that the two met at Ragle Park around 2:30 a.m. on August 10, 2022. Phone data shows both cell phones left the park after roughly fifteen to twenty minutes and then traveled to the house belonging to Judah's mother's boyfriend. Soon thereafter, both phones moved along Zia Road, with Samuel's phone ultimately ending up alongside Rodeo Road in a plastic bag.

**B.    The Shooting at Ragle Park**

{11} Direct evidence of what occurred in those twenty minutes after Judah and Samuel first met at the park is limited. Much of the evidence the jury heard regarding what occurred that night was from Judah's own testimony. Before delving into Judah's account, we first focus on the evidence the State presented at trial.

**1.      State's evidence**

{12}     At roughly 4:30 a.m. on August 10, 2022, a local man walking his dog found Samuel's body under a pavilion at Ragle Park and called the police. Samuel was face-down with blood pooled around his head and torso. Investigators found Samuel's car keys in his pocket and his car still in the parking lot with his wallet inside. A single bullet casing was found roughly two feet back from where Samuel lay. The casing belonged to a bullet fired from a Smith & Wesson, the type of gun later recovered from Judah's mother's boyfriend's house.

{13}     The State's forensic pathologist testified that Samuel died from a single bullet entering the back of his head at an upward trajectory and exiting his forehead between his eyes. The bullet entered just below the center of Samuel's head and slightly off to one side. Based on analysis of the entry wound, the State's forensic pathologist testified to how close she believed the shooter was behind Samuel. After explaining to the jury that firing distance generally falls into one of three buckets—contact, intermediate, and distant and/or indeterminant—she concluded the shot that killed Samuel was fired from a distant and/or indeterminant distance. The absence of any material from the gun on Samuel's skin ruled out both contact and intermediate distance, which is characterized by "inches to feet." This means the shot that killed Samuel was fired from "feet to more feet" away.

{14} There was some scraping on Samuel's right hand and on his face. Investigators swabbed Samuel's fingernails for foreign DNA and ran a sexual assault testing kit. They did not find any foreign DNA, including any DNA from Judah.

{15} Sometime after shooting Samuel, Judah called his ex-girlfriend, Especial Garcia, who testified that Judah said he "did something bad" and that he sounded scared, but he never told her exactly what happened that night. Finally, security camera footage captured Judah returning to the house that night through the garage before leaving through the front door holding a clear plastic bag with Samuel's phone inside.

**2. Judah's testimony**

{16} Judah testified that he agreed to meet Samuel at Ragle Park because it was a public place. He also testified that out of roughly eight prior encounters from Grindr, all were in public because it made him feel safer. This was the first time he met with someone from Grindr at Ragle Park; he usually met people during the day in public restrooms and only once previously at night at his grandmother's apartment building.

{17} Before meeting with Samuel, Judah grabbed his mother's boyfriend's Smith & Wesson from the garage. Judah researched how to remove the gun lock and load the gun before going out. He placed the unlocked and loaded gun in the right-side pocket of his jacket. Judah testified that he always armed himself before meeting

with someone from Grindr, taking "mostly just pocket knives." He did not have his usual knife with him because he was living between his mother's boyfriend's house, his dad's house, and his grandmother's house. This was the first time he took a gun to a meetup—in fact the first time he had access to the gun—taking it with him because it made him feel safer.

{18} Judah arrived at the park and found it to be darker than he anticipated. No one was around. He approached Samuel, observing that he was over six feet tall and weighed roughly 300 pounds. Judah was five-and-a-half feet tall and weighed between 150 and 160 pounds.

{19} Samuel suggested the two go to the nearby baseball dugouts, which Judah described as "a dark, secluded area." Judah refused, testifying that he was afraid if he went to the dugouts with Samuel, Samuel would rape him. When he refused, Samuel became angry and asked if Judah was just going to stand there. Stating he "felt frozen" and overwhelmed with anxiety, Judah thought he was not going to make it home that night.

{20} At that point, Judah said that Samuel grabbed his left arm with his right hand, and when Judah "pulled [Samuel's] hand away," his "body, it felt like it went out of shock, like it went into a self-defense kind of mode, it felt like it was acting on its own." When Judah pulled his arm away, Samuel told him to stop, grabbed his arm a

second time, and squeezed. Judah said he had to "peel" Samuel's hand off of his arm. At that point, Judah said he thought Samuel went for his neck and that he pushed Samuel's arm away. Judah testified that Samuel then punched him on the left side of his chin with his right fist hard enough that Judah stumbled to his right. Judah said that when he stumbled, he pulled the gun out of his right pocket, pointed the gun over his shoulder "facing up," and fired one time. He said Samuel's phone dropped by Judah's left leg. Judah grabbed the phone and took off out of the park without looking back and not knowing if Samuel was hit or not.

## C. Jury Instructions at Trial and Verdict

{21} The jury was instructed on first-degree murder, second-degree murder, and voluntary manslaughter. Defense counsel did not request a self-defense instruction and none was given. The jury was instructed on motive, UJI 14-5029, and flight, UJI 14-5030 NMRA (2023), both of which include a use note stating, "No instruction on this subject shall be given."

## II. DISCUSSION

{22} To support the first-degree murder charge, the State was required to present evidence supporting an inference that Judah "actually deliberated" before shooting Samuel. *State v. Adonis*, 2008-NMSC-059, ¶¶ 1, 22, 25, 145 N.M. 102, 194 P.3d 717; UJI 14-201 NMRA (2023) ("A mere unconsidered and rash impulse, even

though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice."). The bulk of the State's evidence provides insight into what happened after the shooting. The only evidence the State cites ahead of the killing that might be probative of deliberate intent is Judah's decision to take a gun to the encounter. But while this Court has found that taking a gun to an encounter might support an inference of deliberate intent, those cases are distinguished by the presence of evidence of actual deliberation. Simply put, the State did not present *any* evidence as to when Judah decided to pull the trigger or what he was thinking when he did so.

{23}    Therein lies the flaw at the core of the State's case: it asks this Court to pull discrete facts that, in context, supported deliberate intent in other cases, strip those facts of their context, and add them together to reach an inference of deliberate intent. In cases where the Court has cited, for example, the defendant bringing a gun or after-the-fact evidence as evidence of deliberate intent, those facts were always accompanied by evidence of actual deliberation that empowered the jury to make an inference rather than to merely speculate as to the defendant's mental state. That evidence is absent here.

{24} Accordingly, we take this opportunity to place the evidence the State relied upon in this case back into its context. In doing so, it becomes clear that those facts are simply not probative of deliberate intent in this case and that, even when viewed holistically, the evidence presented at trial required the jury to speculate as to whether Judah deliberated before killing Samuel.

**A. Standard of Review**

{25} When reviewing sufficiency of the evidence, the Court asks whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted). "New Mexico appellate courts will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (text only) (citation omitted).

{26} That established, it is "the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Vigil*, 2010-NMSC-003, ¶ 4, 147 N.M. 537, 226 P.3d 636 (internal quotation marks and citation omitted). While appellate courts indulge

all reasonable inferences in favor of the jury's verdict, "an inference must be linked to a fact in evidence." *State v. Slade*, 2014-NMCA-088, ¶ 14, 331 P.3d 930.

**B.    The State's Proffered Evidence of Deliberate Intent**

{27}    The State emphasizes the steps that Judah took to prepare the gun before meeting with Samuel and argues that Judah's account of the altercation is belied by the forensic evidence. At trial, in efforts to defeat the defense's motion for directed verdict, the State argued that the absence of evidence of a struggle, shown by a lack of foreign DNA on Samuel, and the fact that Samuel was shot in the back of the head were sufficient to support an inference of deliberate intent. In closing argument and in this appeal, the State leaned more heavily on the version of events derived from Judah's own testimony. The State challenges Judah's assertion that he was scared of Samuel by highlighting Judah's failure to flee. While this could be seen as evidence that challenges Judah's testimony that he was scared of Samuel, the State offers it as evidence of deliberate intent and does so without authority. In addition, the State relies on the fact that Judah took Samuel's cell phone, as well as his statement that he "did something bad," to demonstrate consciousness of guilt, which it argues supports an inference of deliberate intent. Judah argues that the evidence of deliberate intent was wholly insufficient, limited to the fact that Judah prepared and

took a gun to the meeting, the improbability of Judah's account, and consciousness-of-guilt evidence.

{28}    Mindful of our obligation to refrain from parsing the evidence, we take this opportunity to explain why much of the State's evidence is plainly not probative of deliberate intent in this case. We then turn to the remaining evidence as a whole to explain why, even when viewed in the light most favorable to upholding the verdict, it falls short of proving deliberate intent.

**1.    Judah's failure to flee**

{29}    The State argues that Judah's failure to run from Samuel—a much older, larger, and presumably slower individual—after Samuel became aggressive supports an inference of deliberate intent. The State does not cite any cases in which failure to flee under comparable circumstances supported an inference of deliberate intent. Indeed, Judah's failure to flee, at most, indicates that he had time to deliberate, which is insufficient to support an inference of deliberate intent absent evidence that he actually did so. *See Adonis*, 2008-NMSC-059, ¶¶ 20-22 (stating that despite the killer having "an opportunity to deliberate, the burden remains on the [s]tate to produce evidence that tends to show that the killer actually did so" (internal quotation marks and citation omitted)).

{30}     The State attempts to equate failure to flee with a prolonged struggle, relying on caselaw in which evidence of a prolonged struggle supported an inference of deliberate intent. *See State v. Flores*, 2010-NMSC-002, ¶ 21, 147 N.M. 542, 226 P.3d 641, *overruled on other grounds by State v. Martinez*, 2021-NMSC-002, ¶¶ 72, 77, 478 P.3d 880. However, a prolonged struggle manifests into deliberate intent where the *victim* struggles to escape or fight back and the killer persists in killing them anyway, demonstrating an enduring commitment to killing the victim and thereby supporting an inference of deliberation. *See State v. Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (finding deliberate intent to kill when the defendant strangled the victim to death over several minutes in addition to having motive to kill the victim); *see also State v. Duran*, 2006-NMSC-035, ¶ 11, 140 N.M. 94, 140 P.3d 515 (concluding evidence of a prolonged struggle, multiple stab wounds, the victim attempting to escape, and the defendant's statements reflecting his intent were sufficient to find deliberate intent). That is plainly not the case here—where Judah claimed he struggled to pull away from Samuel and had to defend himself for fear of being sexually assaulted. The State did not present a counter to that narrative, and although free to disbelieve Judah's account, the jury had no basis upon which to build an alternative story of a prolonged struggle.

{31} Furthermore, the State's argument seeks to criminalize an instinctive freeze response that many victims of sexual violence experience during an assault. *See* RAINN, *Fight, Flight, Freeze, & Fawn: Understanding Survival Responses*, https://rainn.org/mental-health-therapy-support-after-sexual-violence/fight-flight-freeze-and-fawn-understanding-survival-responses/ [https://perma.cc/F3GF-SQYF] (last visited June 5, 2026). Judah's testimony was that he "felt frozen" with anxiety when he perceived Samuel become angry and aggressive, which is consistent with a freeze response to assault. Concluding that such a response, on its own, supports an inference of deliberate intent would be divorced from the realities of experiencing assault, particularly sexual assault, and punish victims for what experts understand to be involuntary responses to traumatic events. *See id*. We decline to conclude that such a response is evidence of deliberate intent in this case.

**2.    Consciousness-of-guilt evidence**

{32} The State also argues that Judah disposing of Samuel's phone, telling Especial that he "did something bad," and appearing calm on security camera footage after the killing support an inference of deliberate intent. These are all pieces of evidence that demonstrate consciousness of guilt, but they are not probative of deliberation in this case. The State's reliance on these facts exemplifies a problematic conflation of

consciousness-of-guilt evidence with evidence of deliberate intent that has arisen following our holding in *Flores*, 2010-NMSC-002, ¶¶ 22-23.

{33} This Court has allowed some consciousness-of-guilt evidence to support an inference of deliberate intent. *See id.* In *Flores*, after analyzing over a dozen pieces of evidence supporting the jury's finding of deliberate intent—some of which arose after the killing—the Court observed that "[n]ot only may [a d]efendant's acts before and during the crime provide evidence of intent, evidence of flight or an attempt to deceive the police may prove consciousness of guilt." *Id.* (internal quotation marks omitted). Since *Flores*, consciousness-of-guilt evidence has been occasionally conflated with evidence supporting an inference of deliberate intent. *See State v. Arredondo-Soto*, S-1-SC-35112, dec. ¶ 36 (N.M. June 2, 2016) (nonprecedential) ("Such evidence of flight or attempt at deceiving law enforcement can demonstrate consciousness of guilt that supports a conviction of deliberate intent." (citing *Flores*, 2010-NMSC-002, ¶¶ 22-23)). Indeed, the State asks the Court to conflate the two in this case.

{34} However, to support that proposition, *Flores* relied on *State v. Martinez*, 1999-NMSC-018, ¶¶ 29-30, 127 N.M. 207, 979 P.2d 718, which did not, itself, discuss consciousness-of-guilt evidence as at all pertinent to proving deliberate intent. *See Flores*, 2010-NMSC-002, ¶ 23. Rather, *Martinez* solely addressed consciousness-

of-guilt evidence in the context of whether it is admissible under Rule 11-404(B) NMRA (1999), observing that courts have "previously recognized that consciousness of guilt, *like intent* or motive, constitutes a permissible use of other acts or wrongs under Rule 11-404(B) [(1999)]." *Martinez*, 1999-NMSC-018, ¶ 29 (emphasis added). Digging several layers into the cases *Martinez* relied upon, those cases also addressed the *admissibility* of acts demonstrating consciousness of guilt, not any potential tie to deliberate intent. *See State v. Trujillo*, 1981-NMSC-023, ¶ 31, 95 N.M. 535, 624 P.2d 44 (affirming the admission of other acts evidence under reasoning that "[e]vidence of flight or an aborted plan of flight is admissible and relevant because it tends to show consciousness of guilt"). With respect to intent alone, one Court of Appeals case has acknowledged that, under specific circumstances, efforts to suppress evidence might be admissible to support an inference of *criminal* intent. *See State v. Ruiz*, 1995-NMCA-007, ¶ 9, 119 N.M. 515, 892 P.2d 962. However, the idea that there is a per se direct link between consciousness of guilt and deliberate intent, as suggested by the statement in *Flores*, is not borne out in the cases *Flores* relied upon. *See Flores*, 2010-NMSC-002, ¶ 23.

{35} Rather, such evidence must be closely scrutinized and is insufficient absent other evidence of deliberate intent or specific facts making the conduct highly probative of deliberation. *See State v. Astorga*, 2015-NMSC-007, ¶¶ 63-65, 343 P.3d

1245 (acknowledging that the defendant's statements that he "'blasted that cop'" "might have been insufficient" on their own but were probative of deliberate intent given the additional evidence of intent, including a strong motive to kill). Any such evidence is absent here.

{36} Judah's efforts to dispose of Samuel's phone and his scared statements to Especial that he had done "something bad" are not nested in additional facts showing deliberation, and they do not, themselves, even imply deliberation. Judah called his friend, sounding afraid, before waking his mother to drive him to throw Samuel's cell phone out of a car window. While indicative of consciousness of guilt, nothing about that evidence sheds light on his state of mind before or during his encounter with Samuel. *See Slade*, 2014-NMCA-088, ¶¶ 28-31 (concluding that hiding evidence, in that instance the murder weapon, and admitting to shooting the victim demonstrated consciousness of guilt but did not support an inference of deliberate intent).

{37} The State also argues that Judah did not appear panicked or remorseful on security camera footage of him after the killing presented at trial, which further supports an inference of deliberate intent. And while this Court has held that a lack of remorse can support a finding of deliberate intent, the cases in which it did so involve the defendant's overt expressions evincing a lack of remorse or the

defendant calmly watching while the victim died. *See State v. Guerra*, 2012-NMSC-027, ¶ 29, 284 P.3d 1076 (relying, in part, on the defendant stating "'I think I stabbed that fool seven or eight times,'" celebrating the killing, and "acting as if nothing had happened after he returned from the attack" as evidence of deliberate intent); *see also Duran*, 2006-NMSC-035, ¶ 9 (citing the defendant's statements after the killing that he "hurt a lady and stabbed her eight or nine times" and that he "'straight up murdered some bitch'" to support an inference of deliberate intent). Here, there is no outward expression, only security camera footage showing Judah texting on his phone before getting in his mother's car to go dispose of Samuel's phone. The jury would have to speculate that the absence of clear distress indicates a lack of remorse and that the lack of remorse indicates deliberation. There is no factual basis for either.

**3.      The gun and the forensic evidence**

{38}      Having concluded that the evidence discussed above is simply not probative of deliberate intent, the State's case is left with the fact that Judah took a loaded gun to the meetup with Samuel and that Samuel ended up with a single gunshot to the back of his head without any apparent signs of struggle. Without evidence indicating actual deliberation, those facts are insufficient to support an inference of deliberate intent.

{39} A defendant bringing the murder weapon to the scene of the killing has, of course, been one piece of evidence that this Court has cited in support of a finding of deliberate intent. *See State v. Lucero*, 1975-NMSC-061, ¶ 7, 88 N.M. 441, 541 P.2d 430 (considering the fact that the defendant brought a loaded and concealed gun to the scene of the murders when analyzing the evidence of deliberate intent). However, in those cases, the presence of the murder weapon weighed in the context of considerable additional evidence of deliberation. *See id.* (finding sufficient evidence of deliberate intent where the defendant took a loaded gun to a clinic where he was not being treated and accused the victim, a "suspected informer," of being a "'rat'" before shooting the victim and his wife); *see also Flores*, 2010-NMSC-002, ¶ 22 (concluding that the defendant "carried the screwdriver with him to the fatal confrontation for no other discernible purpose than to use it as a weapon" in addition to fifteen other pieces of evidence supporting deliberation, including traveling to New Mexico in pursuit of the victim, stalking him over several days, lying in wait for the victim to be alone, and stabbing him repeatedly). Here, in contrast, Judah taking the gun to his encounter with Samuel is the State's primary piece of evidence arising before the shooting that it claims supports an inference of deliberate intent.

{40} We decline to adopt a rule that taking a firearm to an encounter, alone, supports an inference of deliberate intent to kill absent corroborating evidence of

actual deliberation. On that point, *Adonis* and *Slade* instruct that merely bringing a gun to the crime scene, or even retrieving a gun, is insufficient to support an inference of deliberate intent absent evidence that the defendant actually deliberated. In *Slade*, the state argued that the defendant arriving to the scene armed with a gun supported an inference of deliberate intent. 2014-NMCA-088, ¶ 25. Rejecting that argument, the Court of Appeals surveyed cases in which bringing a gun was evidence of deliberate intent and concluded that all of those cases involved other evidence supporting the inference, specifically strong motive. *Id.* Additionally, the Court of Appeals observed that the fact that a defendant usually carries a gun cut against an inference that the defendant brought it to the scene with the intent to kill. *Id.* ¶ 26 ("[I]n the context of the defendant's normal practice to carry a gun while on break from work, the mere presence of the weapon was insufficient to demonstrate a willful and deliberate intent to kill the victims."). Similarly, the jury in this case heard that Judah was always armed during Grindr meetups, but he had left his knife at his grandmother's apartment that night so decided to take the gun instead.

{41}     And in *Adonis*, the Court concluded that the defendant retrieving a gun—even when he did so with sufficient time to deliberate—was insufficient absent evidence of actual deliberation. 2008-NMSC-059, ¶ 22. The Court explained:

> While the retrieval of a weapon before killing a victim could potentially
> give a killer an opportunity to deliberate, the burden remains on the

[s]tate to produce evidence that tends to show that the killer "actually did so." In this case, the evidence fails. The [s]tate did not introduce any evidence about what [the d]efendant actually did before he shot [the v]ictim. For example, there was no eyewitness testimony about the events leading up to the shooting, nor was there any testimony from a co-conspirator, or any other witness, that could shed light on [the d]efendant's plan or motive to kill [the v]ictim. In short, the facts relied upon by the [s]tate only prove that [the d]efendant killed [the v]ictim intentionally, but fail to prove that [the d]efendant committed the killing with the deliberate intention to take [the v]ictim's life, which is necessary to prove first-degree murder.

*Id.* (quoting *State v. Taylor*, 2000-NMCA-072, ¶ 22, 129 N.M. 376, 8 P.3d 863). Here, the State's evidence was similarly devoid of any information about what Judah "actually did before he shot [Samuel]." *Id.* The jury heard virtually no evidence regarding the events leading up to the encounter outside of Judah's own testimony, which was devoid of any indication that he deliberated before firing the gun.

{42} Instead of offering evidence of deliberation before the shooting, the State focuses on discounting Judah's version of events. To that end, the State relies heavily on the absence of Judah's DNA on Samuel and contends this proves there was not a struggle, and it emphasizes the improbability that Judah fired once over his shoulder and hit Samuel in the head. Those facts, according to the State, discredit Judah's story and support an inference of deliberate intent.

{43} However, as Judah argues, the forensic evidence does not necessarily contradict his account. He testified that Samuel grabbed his wrist twice and punched

his left cheek; this was not presented as an extended brawl that might result in DNA transfer. Nor does the conclusion that the shot was fired from "feet to more feet" away and at an upward trajectory contradict Judah's claim that he was on the ground when he fired. And even if the forensic evidence definitively showed that Judah was lying, Judah being a liar is not enough to convict him of deliberate intent murder; the burden remains on the State to provide the jury with evidence of what it believes actually happened.

{44} Ultimately, the State failed to present evidence that enabled the jury to piece together a story of when or why Judah would have formed the deliberate intent to kill Samuel. While the jury is free to disbelieve Judah's story, they are not permitted to conjure an alternative story based wholly on speculation. Here, the jury would have to assume that one of two scenarios played out in order to reach deliberate intent. In scenario one, Judah planned to kill Samuel all along and took the gun to the meetup with that intent; that scenario requires speculation because the State did not present any evidence of a plan or motive, and we have just said that taking the gun, on its own, is insufficient. In scenario two, the jury would have to believe that Judah did not arrive with the intent to kill Samuel but that at some point in their interaction he formed the deliberate intent to do so. But, again, the State did not present any evidence of what actually happened at Ragle Park outside of the

shooting; there is no evidence of when or why Judah would have formed the deliberate intent to kill.

{45} Finally, the single shot to the back of Samuel's head does not advance a clear theory of deliberate intent. It is true that the single shot supports either scenario discussed above, but that is only because a single shot to the back of the head supports a finding of an *intentional* killing under the circumstances of this case. However, there is no evidence of deliberation that distinguishes the intentional killing in this case from a killing that is intentional but rash and impulsive. As was the case in *Adonis*, "the facts relied upon by the State only prove that [Judah] killed [Samuel] intentionally, but fail to prove that [Judah] committed the killing with the deliberate intention to take [Samuel's] life, which is necessary to prove first-degree murder." 2008-NMSC-059, ¶ 22. The State failed to meet its burden to show actual deliberation, and this Court, accordingly, reverses Judah's conviction for first-degree deliberate intent murder.

{46} Because the jury was instructed on the lesser included offense of second-degree murder and the State adequately proved that charge, we exercise our discretion to remand this case for entry of second-degree murder. *Revels*, 2025-NMSC-021, ¶ 43 ("[W]hen the jury has already found the elements of a lesser included offense beyond a reasonable doubt, the interests of justice are better served

by direct remand for entry of judgment on the lesser included offense." (citing *Haynie*, 1994-NMSC-001, ¶ 3)).

{47} The jury instructions addressed a killing which Judah was indicted for—murder. The jury was also instructed on second-degree murder and was asked to determine whether Judah killed Samuel, whether he knew that his actions created a strong probability of death or great bodily harm, and whether he acted without sufficient provocation. *See* UJI 14-220 NMRA (2023) (explaining to the jury that in deciding the charge of second-degree murder with voluntary manslaughter as a lesser included offense, the difference is that in voluntary manslaughter, the defendant did not act as a result of sufficient provocation). The jury was further instructed on voluntary manslaughter, a crime that is otherwise murder unless it "consists of manslaughter committed upon a sudden quarrel or in the heat of passion." NMSA 1978, § 30-2-3(A) (1994); UJI 14-210 NMRA (2023) (explaining to a jury that when deciding the charge of second-degree murder, where voluntary manslaughter is a lesser included offense, an element of the crime is that the defendant did not act as a result of sufficient provocation); *see also* 2 Charles E. Torcia, *Wharton's Criminal Law* § 155 (15th ed. 1994) ("Voluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation."); 2 Wayne R. LaFave & David C. Baum, *Substantive Criminal Law* § 15.2 (3d ed. 2018)

("Voluntary manslaughter in most jurisdictions consists of an intentional homicide committed under extenuating circumstances."). "[P]roving that the defendant did not act in the heat of passion on sudden provocation is similar to proving any other element of intent; it may be established by adducing evidence of the factual circumstances surrounding the commission of the homicide." *Mullaney v. Wilbur*, 421 U.S. 684, 702 (1975). Finally, the jury was instructed on the definition of provocation. *See* UJI 14-222. Because provocation is a mitigating factor to an illegal killing, it is important to note that it is a question for the jury to decide. *State v. Munoz*, 1992-NMCA-004, ¶ 6, 113 N.M. 489, 827 P.2d 1303 ("Whether a particular set of circumstances [demonstrates] sufficient provocation is generally a question for the jury to decide.").

{48}     The evidence analyzed above was not sufficient to show deliberation. That does not mean, however, that the State failed to adequately prove second-degree murder. Judah testified that he fired a shot over his shoulder in Samuel's direction—testimony sufficient to conclude that Judah "knew that [his] acts created a strong probability of death or great bodily harm to [Samuel]." UJI 14-210 (2023); *Haynie*, 1994-NMSC-001, ¶ 2. Judah also presented evidence that he was provoked, but the jury clearly rejected that story when it chose to convict him of deliberate intent murder rather than "[a] mere unconsidered and rash impulse." UJI 14-201 (2023);

*see also State v. Lobato-Rodriguez*, 2024-NMSC-014, ¶ 23, 548 P.3d 21 ("By returning a verdict of second-degree murder, the jury determined that [the d]efendant did not act in response to sufficient provocation.").

{49} Thus, the interests of justice are best served by direct remand for entry of second-degree murder as opposed to retrial on second-degree murder and voluntary manslaughter.

{50} Finally, because it is a third-degree felony to tamper with evidence of either a capital felony or a second-degree felony, there is no ambiguity as to the level of tampering of which Judah is guilty in this case. Section 30-2-1(B) ("Whoever commits murder in the second degree is guilty of a second degree felony."); § 30-22-5(B)(1) ("[I]f the highest crime for which tampering with evidence is committed is a capital or first degree felony or a second degree felony, the person committing tampering with evidence is guilty of a third degree felony."). Accordingly, we affirm his conviction for tampering.

## III.    CONCLUSION

{51} Because the State failed to present sufficient evidence of deliberation, we reverse Judah's first-degree deliberate intent murder conviction and elect to remand the case for entry of second-degree murder. We affirm Judah's tampering

conviction. Finally, we direct the district court to apply Judah's presentence confinement credit to his sentence in accordance with Section 31-18-15.3(B)(1993).

{52} **IT IS SO ORDERED.**

_____

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

_____

**JULIE J. VARGAS, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**BRIANA H. ZAMORA, Justice**